IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
STATESVILLE DIVISION
CIVIL CASE NO. 5:25-cv-195-MEO-DCK

KYLE BUSCH, Individually and as Trustee )
for the Samantha Lynn Busch Irrevocable )
Life Insurance Trust; and SAMANTHA )
BUSCH, Individually and as Trustee for the )
Kyle T. Busch Irrevocable Life Insurance )
Trust, )
           )
           Plaintiffs, )
           )
v. )
           )
PACIFIC LIFE INSURANCE COMPANY; )
RODNEY A. SMITH; and RED RIVER )
LLC, )
           )
           Defendants. )
           )

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
PACIFIC LIFE INSURANCE COMPANY'S MOTION TO DISMISS
PLAINTIFFS' AMENDED COMPLAINT**

---

# TABLE OF CONTENTS

*Page*

INTRODUCTION ........................................................................................................ 1

RELEVANT FACTS .................................................................................................... 5

    A.    Plaintiffs Purchase Indexed Universal Life ("IUL") Insurance Policies ............... 5

    B.    The Policy Applications ...................................................................................... 6

    C.    The Policy Illustrations ...................................................................................... 8

    D.    Policy Delivery Receipts and the Free Look Right ............................................ 10

    E.    This Lawsuit ...................................................................................................... 11

LEGAL STANDARD .................................................................................................. 11

ARGUMENT .............................................................................................................. 12

I.    NEARLY ALL OF PLAINTIFFS' CLAIMS ARE TIME-BARRED BY THE APPLICABLE STATUTES OF LIMITATION ............................................................... 12

    A.    Plaintiffs' Negligence Claims Are Time-Barred ................................................. 12

    B.    Plaintiffs' Claims For Breach Of Fiduciary Duty, And Negligent Misrepresentation Are Time-Barred, As Are Nearly All UDTPA Claims .......... 13

II.    PLAINTIFFS' FRAUD-BASED CLAIMS FAIL TO SATISFY THE PARTICULARITY REQUIREMENTS OF RULE 9(b) ................................................. 16

III.    PLAINTIFFS' CLAIMS AGAINST PACIFIC LIFE INDEPENDENTLY FAIL .......... 18

    A.    Plaintiffs' UDTPA and Negligent Misrepresentation Claims (Third And Fifth Causes Of Action) Fail As A Matter Of Law ............................................... 18

        1.    Plaintiffs' misrepresentation claims fail because they are predicated on statements of opinion or statements concerning future events ........... 19

        2.    Plaintiffs do not plead, and cannot establish reasonable or justifiable reliance on any purported misrepresentations or omissions .................... 21

    B.    Plaintiffs' Negligence Claim (Second Cause Of Action) Fails ............................ 22

# TABLE OF CONTENTS
(continued)

C.       Plaintiffs' Breach Of Fiduciary Duty Claim (Fourth Cause Of Action) Fails ........................................................................................................................... 24

CONCLUSION ................................................................................................................ 25

CERTIFICATE OF SERVICE ........................................................................................ 27

ARTIFICIAL INTELLIGENCE CERTIFICATION ....................................................... 28

## INTRODUCTION

The Plaintiffs, NASCAR driver Kyle Busch and his wife Samantha, purchased five Pacific Life insurance policies between 2018 and 2022, providing over $90 million in insurance protection on the life of Kyle Busch as he engaged in a highly risky occupation. Plaintiffs chose to purchase Indexed Universal Life ("IUL") policies, a popular form of life insurance that provides immediate death benefit protection and the opportunity to accumulate cash value when the policies are held for the long term. An IUL policy owner can allocate policy value to a "fixed account" that pays a fixed interest rate, or to "indexed accounts" that credit interest if there is positive performance in an outside stock index, such as the S&P 500. An IUL policy's value depends significantly on paying sufficient premiums in a timely manner to properly fund the policy and earn interest credits, and holding the policy for the long term so its cash value can grow over the years. IUL has provided families and businesses with valuable protection for nearly 30 years.

Surrounded by their own team of financial and legal advisors,[1] the Busches applied for multiple high-dollar life insurance policies from Pacific Life, attesting that each policy "as applied for" would "meet [their] insurance needs and financial objectives" based on their "income, net worth," and other factors. *See infra* p. 7. Plaintiffs agreed that they and their producer, not Pacific Life, were "responsible for ensuring that the policy meets [their] insurance needs and financial objectives." *Id.* Plaintiffs signed policy illustrations indicating they intended to pay planned premiums and hold the policies over 30 years through age 70 and beyond, but instead of keeping the policies long enough to capitalize on their growth potential, Plaintiffs failed to timely pay

---

[1] *See* Amended Complaint (the "Complaint," cited as "Compl.") ¶ 29 (Dec. 12, 2022 Email to Jonathan Hadaya (Kyle Busch's attorney), CJ Figueroa (then-current Chief Revenue Officer at Kyle Busch Motorsports), Nancy Knutelsky (then-current Controller for Kyle Busch Motorsports), Kory Klug (CPA), and Michael Beals (corporate and trust attorney).

planned premiums, failed to monitor allocation of their policy values between indexed and fixed accounts, and surrendered the policies or allowed them to lapse. Rather than accept responsibility for their own decisions, Plaintiffs now attempt to blame their negative outcome on the IUL product—a product approved by insurance regulators in every state—and purported oral promises that are directly contradicted by express written disclosures they acknowledged and signed.

The essence of the Complaint is that Rodney Smith ("Smith"), an independent producer, allegedly told Plaintiffs that their policies would operate like a "custom retirement plan," providing Plaintiffs with "tax-free retirement income" for life (Compl. ¶¶ 28, 30), and that the policies were guaranteed to be "fully funded" (Compl. ¶¶ 2, 39, 42) "after a limited number of annual payments and that *no additional funding would ever be required*." *Id*. ¶ 29.[2] The Complaint repeatedly alleges that policy illustrations ("Illustrations") were misleading, but never identifies any false statements in the Illustrations.[3] These claims are remarkably similar to those rejected by the district court in *Stegelin v. Pacific Life*, which involved the same Pacific Discovery Xelerator ("PDX") policy purchased in 2018 by Plaintiffs here. *Stegelin*, 592 F. Supp. 3d at 480. One of the plaintiffs in *Stegelin* alleged a producer sold him a Pacific Life IUL policy as "a strategy for creating 'tax-free' retirement income," *id*. at 478, and that he "was induced to purchase the Policy based on alleged misrepresentations or omissions in the Illustrations regarding how the Policy might

---

[2] Unless otherwise indicated, all emphasis in this memorandum is added and internal quotations and citations are omitted.

[3] *See, e.g.*, Compl. ¶¶ 1-2, 26, 29-30, 37, 55-56, 87, 163h., 190, 196j., 198, 210, 215d., 231d. Plaintiffs' five policies are referred to collectively as the "Policies." Copies of the Policies are attached to this memorandum as **Exhibits A-E**, and copies of Illustrations for the Policies are attached as **Exhibits F-J**. Because the Policies and Illustrations are expressly referenced and relied upon in the Complaint, this Court may properly consider these documents in analyzing this motion to dismiss. *See Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 625 (4th Cir. 2008) (considering investment reports attached to motion to dismiss); *Stegelin v. Pacific Life Ins. Co.*, 592 F. Supp. 3d 474, 480 n.3 (D.S.C. 2022) (considering policy and illustrations attached to motion to dismiss), *aff'd sub nom. Gugel v. Pacific Life Ins. Co.*, 2024 WL 194172 (4th Cir. Jan. 18, 2024).

perform in the future." *Id*. at 481-82. The court dismissed the misrepresentation claims with prejudice, holding that "Pacific Life's conspicuous and repeated disclaimers that all non-guaranteed elements in the illustration were *not guaranteed* refute [plaintiff's] theory …." *Id*. at 489 (emphasis in original). The court further held, "because the Illustrations include written disclosures that refute any claim of reliance," "any reliance *would not be justifiable as a matter of law*." *Id*. at 490. The *Stegelin* opinion was affirmed by the Fourth Circuit. *Supra* note 3.[4]

The Complaint here is filled with inflammatory and disingenuous rhetoric, but none of it shows any wrongful conduct by Pacific Life. For example, the Complaint includes part of an Illustration for Plaintiffs' 2022 $25.3 million Policy (Compl. ¶ 97) and admits it fully *discloses* charges against premium over a 10-year period and shows the resulting cash value each year. Yet Plaintiffs inexplicably contend they could not understand "the true economic impact of the transaction." *Id*. ¶ 100. Plaintiffs repeatedly complain about a so-called "compensation-driven" policy design allegedly based on "concealed internal mechanics" (*id*. ¶ 40), commissions that they mischaracterize as "excessive compensation" (*id*. ¶ 44), and "inflated" premiums that Plaintiffs *themselves* established. *Id*. ¶¶ 44, 78, 80, 83-84, 112. But given the detail in the illustrations, Plaintiffs were fully capable of evaluating the economics of their Policies, and there is no support for their allegation that they could not evaluate the "real-world operation of the policies." *Id*. ¶ 135.[5]

---

[4] *Stegelin* was also filed by Robert Rikard, Plaintiffs' counsel here.

[5] In another puzzling claim, the Complaint admits that the "illustrations disclosed that death benefit[s] … would be reduced in later policy years," but insinuates that this is somehow wrongful. *See* Compl. ¶ 79. High-face amount policies, however, with large up-front premiums in early years and a reduced death benefit in later years may be particularly appropriate for individuals (such as professional athletes) who may have a limited window of high income years and select a flexible product like an IUL policy to meet their needs.

As for the legal claims against Pacific Life, they should be dismissed for several independent reasons. *First*, except for one claim under the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") relating to the April 2022 Policy, all claims are time-barred by the four-year statute of limitations applicable to the UDTPA claim, or the three-year limitations period applicable to all other claims. *Second*, Plaintiffs fail to plead their fraud-based UDTPA and negligent misrepresentation claims with particularity, as required by Rule 9(b). *Third*, Plaintiffs fail to establish that Pacific Life violated any legal duty—as required for their negligence and breach of fiduciary duty claims. *Fourth*, the Complaint fails to allege any misrepresentation by Pacific Life of a *past or existing fact. Stegelin*, 592 F. Supp. 3d at 488. Indeed, the Complaint never identifies a single false statement by Pacific Life, because there is none. *And fifth*, given the Illustrations' repeated disclosures that they were not intended to predict future performance, justifiable reliance does not exist as a matter of law. *Id*. at 490.

In sum, Plaintiffs made choices reflected in their Applications, Policies, and Illustrations that they desired high-face amount policies they would keep through retirement, and intended to make timely premium payments with accumulated policy values allocated to Indexed Accounts tracking the S&P 500. Despite access to a team of their own professional advisors, Plaintiffs failed to manage their Policies and now proffer a series of baseless claims that ignore clear, repeated, and explicit disclosures that illustrated values were "not guaranteed" and that the Policies would <u>*not*</u> be "paid up" after five annual premium payments. While the Policies were in force, Plaintiffs had as much as $90 million of valuable insurance coverage on the life of Kyle Busch while he engaged in an ultrahazardous activity (plus insurance on Ms. Busch). There is no legal basis to provide Plaintiffs with a massive windfall by refunding all of their premiums. The claims against Pacific Life should be dismissed with prejudice.

## RELEVANT FACTS

### A.      Plaintiffs Purchase Indexed Universal Life ("IUL") Insurance Policies

Contrary to Plaintiffs' suggestion that IUL insurance is somehow inherently flawed (*see* Compl. ¶¶ 88, 144, 163a, 186), IUL policies are sold by almost every major life insurance company in the country.[6]  Through the first three quarters of 2025, IUL policies accounted for 25% of all new life insurance sales in the U.S.[7]  IUL policies provide life insurance protection to millions of families and businesses across the U.S.  Moreover, IUL policies have been approved for sale in every state by insurance regulators, including North Carolina.  Pacific Life's IUL policy forms were filed with and approved by the Interstate Insurance Product Commission, and Pacific Life was therefore authorized to issue the Policies in North Carolina.  N.C. Gen. Stat. § 58-91-50.

The Complaint alleges that, in 2017, Plaintiffs met with Rodney Smith (Compl. ¶ 26), who allegedly told them that, by using Pacific Life IUL insurance policies, Smith could design a "custom retirement plan" that would pay Plaintiffs guaranteed "tax-free retirement income" for life. *Id*. ¶ 28.  In 2018, Kyle and Samantha Busch applied for and purchased two IUL insurance policies from Pacific Life, one insuring the life of Kyle Busch for $28.3 million, and another insuring Samantha Busch for over $6.7 million. *Id*. ¶ 68; Exs. A & B.  In 2020, Plaintiffs increased the insurance on Kyle Busch alone to $90.3 million by purchasing two more IUL policies with death benefits of $17.5 million and $44.5 million.  Compl. ¶ 68; Exs. C & D.  In 2022, Plaintiffs

---

[6] *See* Gretchen Lenth, *Table of the Week: Top 20 IUL Sellers in the First Half of 2025* (Sept. 18, 2025), https://www.lifeannuityspecialist.com/c/4980284/688854?referrer_module =search%20SubFromLASP&highlight=iul%20sales, copy attached as **Exhibit K**.

[7] *See* LIMRA, *U.S. Individual Life Insurance Sales Post Double-Digit Premium & Policy Sales Growth in the Third Quarter* (Dec. 3, 2025), https://www.limra.com/en/newsroom/news-releases/2025/limra-u.s2.-individual-life-insurance-sales-post-double-digit-premium-and-policy-sales-growth-in-the-third-quarter/ (IUL 2025 new premium reached $3.2 billion through Q3).

replaced the 2018 Policy insuring Kyle Busch with another IUL Policy with a death benefit over $25.3 million. Compl. ¶ 69; Ex. E-1.[8]

Like all IUL policies, in addition to a death benefit, Plaintiffs' Policies had "cash accumulation features and options for allocating to accounts that credit interest if there is a positive performance in an outside index, like the S&P 500." *Stegelin*, 592 F. Supp. 3d at 480. The Policy allows the owner to allocate all or a portion of the Policy's Accumulated Value to one or more policy accounts, each referred to as an "Indexed Account." *Id.* "[I]nterest is credited to an Indexed Account based on the performance of the stock market index to which it is linked, subject to certain limits" known as caps. *Id.*; Ex. A-11 (Growth Cap). The Policies also provide downside market loss protection such that, even if the index return is negative, the crediting rate floor is 0%, which insulates the Policy's cash values from index-based losses. *See* Ex. A-11 to A-12. Policyowners can also leave their Accumulated Value in the fixed account, which earns a minimum guaranteed interest rate. *Stegelin*, 592 F. Supp. 3d at 480. The Policies can grow cash values tax-deferred, which if desired can be withdrawn as loans to provide supplemental retirement income on a tax-free basis. *See* Ex. A-48 to A-49. The Policies also allow "flexible" premium payments, meaning the policyholder determines the amount and timing of any premium payments, but each Policy explains it can lapse if sufficient premiums necessary to maintain coverage are not paid:

> Even if Planned Premiums are paid, it is possible that, due to changes in interest credited, and Policy Charges, the Policy may not continue In Force; that is, it may lapse before any death benefit is payable on the death of the Insured.

Policy cover pages, Exs. A-1; B-1; C-1; D-1; E-1.

### B. The Policy Applications

Plaintiffs submitted applications to purchase the Policies (the "Applications"), which are

---

[8] Exhibit pages are numbered sequentially and cited in the format Ex. A-1, A-2, etc. "Ex. E-1" refers to the first page of Exhibit E.

part of the insurance contract. *See, e.g.*, Ex. A at A-50 (Entire Contract).[9] For example, Samantha Busch as Trustee of the Kyle T. Busch Irrevocable Life Insurance Trust (ILIT) applied for the 2018 Policy insuring the life of Kyle Busch, indicating a Planned Annual Premium of $1,000,000. *See id*. (Feb. 2018 Application) at A-76. Kyle Busch was the insured, and Samantha Busch, as Trustee of The Kyle T. Busch ILIT, was the policyowner. *Id.* at A-76 to A-77.

In each Application, the proposed insured and policyowner acknowledged and agreed, among other things, that: "The policy as applied for in this application *will meet my insurance needs and financial objectives* based in part upon my age, income, net worth, tax and family status, and any existing insurance policies I own"; and that "only the Producer signing this application is responsible for ensuring that the policy meets my insurance needs and financial objectives, regardless of whether a [Pacific Life] employee attended any meetings to discuss the policy."[10]

In the Applications, the insured and policyowner also attested that they understood the indexed account feature of the Policies and that policy values were "not guarantees":

> 10. If this application is for a product with an indexed feature, I ACKNOWLEDGE that: I am applying for a product with an indexed feature, for which the crediting for the indexed account tracks the gains and the losses of an outside financial index, subject to a floor and either a growth cap or a threshold, whichever applies. I further understand that, while the values of the policy may be determined in part, by reference to an external index, the indexed feature does not directly participate in any stock or equity investments and values shown to me, other than the minimum values, are not guarantees, promises, or warranties.

---

[9] Copies of the Applications are attached to the Policies. *See, e.g.*, Application For Individual Life Insurance, signed Feb. 21, 2018 (the "Feb. 2018 Application"), Ex. A-76 to A-87.

[10] Application, Declarations of All Signing Parties ¶¶ 9, 14, Exs. A-86 to A-87; B-100 to B-101; C-119 to C-120; D-119 to D-120; E-99 to E-100. The Applications also require the insurance producer (Smith) to certify: "I have reviewed this request/application, and have determined that its proposed purchase is suitable as required under law, based in part upon information provided by the Applicant, Policyowner and Proposed Insured …." Application, Producer Certification ¶ 4, Exs. A-87; B-101; C-120; D-120; E-100.

*Id*. ¶ 10, at A-86; B-100; C-119; D-119; E-99.  Plaintiffs signed and certified their answers were true.  *Id.* at A-87; B-101; C-120; D-120; E-100.

## C.     The Policy Illustrations

The Illustrations delivered to and signed by the Plaintiffs when they purchased the Policies contradict their claims.  The Illustrations contain different scenarios showing how the Policy could perform in the future based on certain assumptions and options *chosen by Plaintiffs*, including the Policy's face amount, the planned premium amount, frequency of premium payments, death benefit option, and the indexed accounts to which allocations would be made.  For example, the Illustration for the 2018 Policy insuring Kyle Busch (the "Feb. 2018 Illustration") assumes premium payments of $1,000,000 for five years and illustrates how the policy's cash value would accumulate based on a non-guaranteed interest rate of 6.17%.  *See* Ex. F-2.  In the "Premium Outlay" column, the Illustration shows zero premium payments after 5 years.  *Id*.  ***Directly contrary to the Complaint's allegation*** that the Policy would be "fully funded" after these five premium payments, the Illustration expressly states:

> \* A zero in the Premium Outlay column ***does not mean the policy is paid up***. Charges will continue to be deducted from the Accumulated Value as long as the policy remains in-force.  The actual premium amounts and number of years of premium payments that are needed to maintain the illustrated non-guaranteed policy benefits will depend on the policy's non-guaranteed elements and on your actual use of the policy's options.

*Id*.  Similarly, the Jan. 2020 Illustration shows intended premium payments of $1,500,000 for five years assuming a non-guaranteed interest rate of 5.76%.  Ex. I-2.  Again, the Illustration states that "[a] zero in the Premium Outlay column *does not mean that the policy is paid up*."  *Id*. at I-4.  All Illustrations contain this same disclosure.[11]  The Illustrations explain further that "[i]f either no

---

[11] Ex. F-2 to F-8, F-26 to F-35; Ex. G-2 to G-8, G-28 to G-38; Ex. H-4, H-28, H-57, H-61, H-71, H-85, H-100; Ex. I-4, I-14, I-28, I-53, I-57, I-67, I-81; Ex. J-4, J-14, J-19, J-32, J-46.

premiums are paid, or subsequent premiums are insufficient to continue coverage, it is possible that the coverage will expire."[12] The Illustrations make clear that, depending on performance of the Policy: "If the net Accumulated Value is less than the monthly charges, *you will need to pay additional premium* to keep the policy in force, unless the policy has a no-lapse guarantee in effect." Exs. F-11; G-12; H-19; I-19, I-72; J-20, J-35.

Under a heading titled "Important Information," all of the Illustrations state:

**This is an illustration only. An illustration is not intended to predict actual performance. Interest rates, dividends, or values that are set forth in the illustration are not guaranteed, except for those items clearly labeled as guaranteed.**

*Id*. at F-9; G-10; H-16, H-73; I-16, I-69; J-21 (bold font in original). Under a section titled "Non-Guaranteed Assumptions," the 2018 and 2020 Illustrations state:

Values shown in this illustration are based on non-guaranteed policy charges and non-guaranteed crediting rates. Over time, the policy's actual non-guaranteed elements, and perhaps your actual use of the policy's options, are likely to vary from the assumptions used in this illustration. For these reasons, *actual policy values will either be more or less favorable than shown in this illustration*.

Non-guaranteed/current elements are not guaranteed by definition.

*Id.* at F-9; G-10; H-19, H-76; I-19, I-72. The 2022 Illustration contains similar language. Ex. J-23. The applicant is required to sign the Illustration and acknowledge:

**I have received and read a copy of this illustration and understand that any non-guaranteed elements illustrated are subject to change and could be higher or lower. I understand that this is an illustration and not a contract.**[13]

Similarly, the insurance producer certifies that he has "explained that any non-guaranteed elements are subject to change," and he has "made no statements that are inconsistent with [the] illustration."

---

[12] *Id.* at F-11; G-12; H-17, H-74; I-17, I-70; J-22.

[13] Ex. F-24 to F-25; Ex. G-26, G-53; Ex. H-57; Ex. I-53; Ex. J-46 (bold font in original). The 2020 and 2022 Illustrations add the following sentence: "The life insurance producer has told me they are not guaranteed." *See* Ex. H-57; Ex. I-53; Ex. J-46.

*Id.* at F-25; G-53; H-57; I-53; J-46.

The Illustrations for the 2020 and 2022 Policies also required Plaintiffs to acknowledge:

> **I understand that unless the fixed and indexed account credits in my policy are greater than the policy charges …, it will result in a reduction of my policy's accumulated value which may cause my policy to lapse, unless I pay additional premium. I understand this product … should only be used if I am willing to accept these risks.**

Ex. H-57; Ex. I-53; Ex. J-46 (bold font in original).

Contrary to the Complaint, nowhere do the Illustrations show withdrawals from the Policies of "tax-free income for life." Compl. ¶ 212. Rather, the Feb. 2018 Illustration, on a non-guaranteed basis, shows tax-free loans of $710,929 being taken from the accumulated policy value beginning in policy year 19, when Kyle Busch would be 51 years old, and ending in policy year 38, when he would be 70 years old. Ex. F-2 to F-3. Similarly, the Jan. 2020 Illustration, on a non-guaranteed basis, shows anticipated loans of $786,724 being taken from the accumulated policy value beginning in policy year 17, when Kyle Busch would be 51 years old, and continuing through policy year 46, when he would be 80 years old. Ex. I-2 to I-3.

### D. Policy Delivery Receipts and the Free Look Right

When the Policies were delivered to Plaintiffs, they signed Policy Delivery Receipts, in which they certified that, among other things, they received the Policies and understood they must carefully review them, including the Policies' Free Look Right. *See, e.g.*, Ex. L-1.[14] The Policies' Cover Page similarly advises to "**READ YOUR POLICY CAREFULLY**." Ex. A-1 (bold and capitalized font in original). The Policies' Free Look Right allows policyowners to cancel their policies within 20 days for a full refund of premium for any reason. *Id.* ("**Free Look Right - You may cancel this Policy within 20 days after you receive it … and we will refund any premium**

---

[14] Copies of the Policy Delivery Receipts for each Policy are attached as **Exhibits L-P**.

**paid.**") (bold font in original).  Plaintiffs do not allege they exercised their Free Look Right.

E. **This Lawsuit**

On October 14, 2025, more than seven years after Plaintiffs began purchasing Pacific Life insurance policies, they filed this lawsuit.  Notwithstanding the expressly acknowledged disclosures from five separate policies and multiple Illustrations emphasizing that projected Policy values were not guaranteed, the Complaint describes the Illustrations as "assured" outcomes, which purportedly caused Plaintiffs to believe they were purchasing "no-risk" policies that were guaranteed to generate tax-free retirement income for life.  Compl. ¶¶ 33, 146.  Plaintiffs assert claims against Pacific Life for negligence, violations of the UDTPA, breach of fiduciary duty, and negligent misrepresentation.  These claims are without merit and fail as a matter of law.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), the complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Clayton v. Bank of N.Y. Mellon Trust Co. N.A.*, 2017 WL 4225628, at *2 (W.D.N.C. Sept. 21, 2017).  While the Court must accept as true well-pleaded factual allegations, this tenet "is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Twombly*, 550 U.S. at 555 (the court is "not bound to accept as true a legal conclusion couched as a factual allegation").  In addition, where there is a conflict between the allegations in the complaint and an incorporated external document, ***the document controls***.  *See, e.g.*, *Fayetteville Inv'rs v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991) ("[I]n the event of conflict between the bare allegations of the complaint and any exhibit … the exhibit prevails."); *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002) (the court need not accept as true "allegations that contradict matters properly subject to judicial notice or by exhibit"); *Jones v. Vector Fleet Mgmt.,*

*LLC*, 2020 WL 2512982, at *6 (W.D.N.C. May 15, 2020) (allegations "cannot be regarded as true in light of the contradictions apparent in the exhibits attached thereto").

## ARGUMENT

### I. NEARLY ALL OF PLAINTIFFS' CLAIMS ARE TIME-BARRED BY THE APPLICABLE STATUTES OF LIMITATION

#### A. Plaintiffs' Negligence Claims Are Time-Barred

Plaintiffs' claims for negligence are subject to a three-year statute of limitations. N.C. Stat. § 1-52(5); *Birtha v. Stonemor, N.C., LLC*, 727 S.E.2d 1, 7 (N.C. Ct. App. 2012). "A cause of action based on negligence accrues when the wrong giving rise to the right to bring suit is committed, even though the damages at that time be nominal and the injuries cannot be discovered until a later date." *Id.* The discovery rule does not apply to toll the limitations period for ordinary negligence claims unless plaintiffs "allege bodily harm or physical damage to [p]laintiffs' property". *Id.* Neither is alleged here, so the discovery rule does not apply.

Plaintiffs assert that Pacific Life's alleged negligence purportedly allowed Smith, an independent producer, to convince Plaintiffs that they could use Pacific Life's IUL policies as a retirement plan that would provide guaranteed income for life, and that the Policies would be "fully funded" after a finite number of premium payments. Compl. ¶¶ 2, 28, 163e., 175, 196g., 198. The Complaint also alleges that Pacific Life was negligent in "[f]ailing to deliver [a] Buyer's Guide and Policy Summary required by North Carolina law." *Id.* ¶ 196i. Plaintiffs contend they suffered "out-of-pocket" damages by paying premiums for the Policies. *Id.* ¶ 200.

Given these allegations, the statute of limitations on Plaintiffs' negligence claim began to run when Smith made the alleged misrepresentations (i.e., when the wrong was committed), or *at the latest* when Plaintiffs received their Policies and Illustrations, both of which contain terms directly contrary to the allegations that the Policies would be "fully funded" after five years and

would provide a guaranteed "tax-free retirement plan." Plaintiffs had a duty to read their Policies, which would have put them on notice of these claims. *State Farm Mut. Auto. Ins. Co. v. Gaylor*, 660 S.E.2d 104, 107 (N.C. Ct. App. 2008) ("Persons entering contracts of insurance, like other contracts, have a duty to read them and ordinarily are charged with knowledge of their contents.").

Plaintiffs filed this action on October 14, 2025. The statute of limitations for negligence with respect to Plaintiffs' 2018 and 2020 Policies expired in 2021 and 2023, respectively, three years after they received their Policies and Illustrations. Plaintiffs applied for their 2022 Policy on April 18, 2022 (Ex. E-100) and should have been aware of the alleged misrepresentations based on their four prior Policies. All of Plaintiffs' negligence claims are time-barred.[15]

### B. Plaintiffs' Claims For Breach Of Fiduciary Duty, And Negligent Misrepresentation Are Time-Barred, As Are Nearly All UDTPA Claims

Claims for breach of fiduciary duty and negligent misrepresentation are also subject to a three-year statute of limitations. *Jackson v. Minnesota Life Ins. Co.*, 275 F. Supp. 3d 712, 726 (E.D.N.C. 2017); *Toomer v. Branch Banking & Trust Co.*, 614 S.E. 2d 328, 335 (N.C. Ct. App. 2005); and UDTPA claims are subject to a four-year limitations period. N.C. Gen. Stat § 75-16.2. These claims are subject to the discovery rule. N.C. Gen. Stat. § 1-52(9); *Dreamstreet Invs., Inc. v. MidCountry Bank*, 842 F.3d 825, 830 (4th Cir. 2016). "Discovery" means either actual discovery or when the alleged misconduct *should have been discovered* in the exercise of reasonable or ordinary diligence. *State Farm Fire & Cas. Co. v. Darise*, 589 S.E. 2d 391, 396 (N.C. Ct. App. 2003). A plaintiff cannot avoid the statute of limitations by remaining "willfully blind":

> A man should not be allowed to close his eyes to facts readily observable by ordinary attention, and maintain for his own advantage the position of ignorance.

---

[15] Pacific Life and Plaintiffs entered into a tolling agreement effective May 15, 2025. Given that all limitations periods expired prior to May 15, 2025 (except for the UDTPA claim on the 2022 policy), the tolling agreement does not affect the statute of limitations analysis in this motion.

Such a principle would enable a careless man, and by reason of his carelessness, to extend his right to recover for an indefinite length of time, and thus defeat the very purpose the statute was designed and framed to accomplish.

*Id.* at 397 (quoting *Peacock v. Barnes*, 55 S.E. 99, 100 (N.C. 1906)). "[T]he cause of action will be deemed to have accrued from the time when the fraud or mistake was known or *should have been discovered* in the exercise of ordinary diligence." *Id.*; *Jackson*, 275 F. Supp. 3d at 726.

In this case, Plaintiffs complain they were induced to purchase the Policies based on alleged misrepresentations that the Policies were guaranteed to be "fully funded" after a certain number of premium payments and would allow Plaintiffs to take tax-free withdrawals "for life." Compl. ¶¶ 2, 28, 33, 163e., 212. Plaintiffs also allege that Pacific Life failed to disclose that the Policies' "performance depended on non-guaranteed crediting rates," and that the Policies could require "continued premium payments" beyond what was illustrated. *Id.* ¶ 244. Given the express, repeated disclosures in the Illustrations, claims predicated on these allegations are time-barred.

The court's decision in *Underwood v. Northwestern Mutual Life Ins. Co.*, 563 S.E.2d 309 (Table), 2002 WL857703 (N.C. Ct. App. May 7, 2002) (unpublished) is instructive. In *Underwood*, the plaintiff alleged he was induced to purchase a life insurance policy in 1990 based on representations he would need to pay premiums only for nine years before the policy was "paid up." *Id.* at *1. Eight years later, in 1998, when the plaintiff received notice that additional premiums would be required, he filed suit for negligent misrepresentation and violation of the UDTPA. *Id.* The North Carolina Court of Appeals held the claims were time-barred:

Here, plaintiff alleged that defendant Parks orally communicated to him that he need only make premium payments for nine years before the policy was "paid up," evidenced by the illustration in Exhibit A. However, the written policy, … clearly establishes the payment schedule under the policy would be an annual premium payable for sixty-one years. … Therefore, in the exercise of reasonable diligence, *he should have discovered the fraud or misrepresentation when he received the policy* which clearly and significantly differed from the representations made by defendant Parks as illustrated in Exhibit A.

*Id.* at *3 (affirming dismissal of misrepresentation and UDTPA claims as time-barred).

Similar to *Underwood*, a cursory review of the Policies (and Illustrations) would have put Plaintiffs on notice of their purported claims. The Illustrations expressly state that non-guaranteed values are, by definition, *not guaranteed* and not intended to predict actual performance. *See, e.g.,* Feb. 2018 Illustration, Ex. F-9. The Illustrations make clear that the Policies are not "fully funded" or "paid up" after five years and may require additional premiums. *Id.* at F-2. The Illustrations also provide alternative no-growth and intermediate interest rate scenarios showing that the Policies could lapse in early years if additional premiums are not paid. *See, e.g., id.* at F-24. In addition, the Illustrations contradict Plaintiffs' alleged promise of "tax-free income for life" (Compl. ¶ 212), instead showing tax-free policy loan withdrawals starting when Kyle Busch is 51 and ending when he is 70 or 80 years old. *See supra* p. 10; Ex. F-2 to F-3; Ex. I-2 to I-3.

The Policies also expressly advised Plaintiffs that the Policies would *not* be "fully funded" after a finite number of premium payments. Every Policy states on its Cover Page:

> Even if Planned Premiums are paid, it is possible that, due to changes in interest credited, and Policy Charges, the Policy may not continue In Force; that is, it may lapse before any death benefit is payable on the death of the Insured.

Exs. A-1; B-1; C-1; D-1; E-1. Plaintiffs "are charged with knowledge of [the Policies'] contents," whether they read them or not. *Gaylor*, 660 S.E.2d at 107.

In sum, all of Plaintiffs' claims accrued when Plaintiffs received their Policies and Illustrations in 2018, 2020, and 2022, respectively. As a result, all claims are time-barred except for the UDTPA claim regarding the 2022 Policy. *See Jackson*, 275 F. Supp. 3d at 723, 726 ("when plaintiffs received the Policy, they had both the capacity and opportunity to discover the [misrepresentations]"); *Underwood*, 563 S.E.2d 309, at *3 (claims accrued upon receipt of the policy); *see also Jasmen Corp. v. Edwards*, 2022 WL 874922, at *3-4 (E.D.N.C. Mar. 23, 2022) (claims accrued at the latest "when Plaintiff received a copy of its insurance policy").

-15-

## II. PLAINTIFFS' FRAUD-BASED CLAIMS FAIL TO SATISFY THE PARTICULARITY REQUIREMENTS OF RULE 9(b)

Even if Plaintiffs' fraud-based claims were not time-barred, the claims would still fail because they do not satisfy the particularity requirements of Federal Rule of Civil Procedure 9(b). Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). Rule 9(b) requires fraud-based claims to specify "the who, what, when, where, and how of the alleged fraud." *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008). Rule 9(b) requires a plaintiff to "at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Just Born II, Inc.*, 888 F.3d 696, 705 (4th Cir. 2018).

Rule 9(b) applies to Plaintiffs' UDTPA and negligent misrepresentation claims. *See Mountaineer Motors of Lenoir, LLC v. Carvana*, 2023 WL 6931787, at *7 (W.D.N.C. Oct. 19, 2023) (UDTPA claims based upon alleged misrepresentations or fraudulent statements "must meet the heightened standard of Rule 9(b) and make its allegations with particularity"); *Williams v. Dukehealth*, 2024 WL 898051, at *9 (M.D.N.C. Mar. 1, 2024) ("Federal courts have repeatedly found that the North Carolina tort of negligent misrepresentation sounds in fraud and have applied Rule 9(b) to it."). The Complaint's allegations fail Rule 9(b) for several reasons.

First, the Complaint repeatedly lumps all "Defendants" together and fails to specify "who" made "what" allegedly false statements to which Plaintiff individually or together. Plaintiffs generally allege that Smith represented the Policies would generate tax-free retirement income for life after a "limited" number of premium payments (*see, e.g.,* Compl. ¶¶ 2, 28-30,33, 212, 240), but they fail to identify *any specific representations* and allege no factual detail regarding each Policy transaction. They do not allege the precise representations allegedly made directly to Kyle

or Samantha Busch, if any, the *number* of premium payments they were allegedly told would fully fund each Policy, or the specific misrepresentations that they allegedly relied on when deciding to purchase their respective Policies. Plaintiffs contend the Illustrations were misleading, but have not identified any specific statements in those Illustrations that are false. *See MichJeff, LLC v. FCX Global, Inc.*, 2025 WL 594979, at *12-13 (E.D.N.C. Feb. 24, 2025) (dismissing misrepresentation and UDTPA claims for failure to identify any specific fraudulent statements).

Second, the Complaint fails to adequately allege "when" any of the alleged misrepresentations or omissions were made. The Complaint alleges that Smith met with Plaintiffs in 2017 and, at some point over several years, misrepresented that each of the Policies would be "fully funded" after a certain number of premium payments, thereafter providing guaranteed tax-free retirement income "for life." *See, e.g.,* Compl. ¶¶ 2, 28-30, 33, 212, 240. These allegations fail to specify the precise dates on which the purported misrepresentations were made, and likewise fail to identify if made directly to Kyle or Samantha Busch. *Sasso v. Tesla, Inc.*, 584 F. Supp. 3d 60, 80 (E.D.N.C. 2022) (dismissing fraud-based UDTPA claim for failing to identify "when [the alleged] misrepresentations took place"); *Williams*, 2024 WL 898051, at *9 (dismissing negligent misrepresentation under Rule 9(b) because "Plaintiff merely alleges that, at some unspecified time, Defendant … represented that [it] would not disclose her protected health information").

Third, the Complaint is devoid of even basic facts describing the place "where" any alleged representations were made, or where Plaintiffs allegedly acted in reliance upon them. *See First Am. Title Ins. Co. v. Network Capital Funding Corp.*, 2025 WL 1508014, at *9 (E.D.N.C. May 27, 2025) (dismissing misrepresentation claim where, among other things, the complaint failed to provide any detail regarding the place of the alleged misrepresentations).

Fourth, Plaintiffs do not identify whether representations were allegedly made orally or in

writing. And with respect to alleged written misrepresentations, if any, they fail to identify any specific documents that contain any alleged misrepresentations. Again, Plaintiffs do not identify any specific false statements of fact in the Illustrations (or any other document). Accordingly, Plaintiffs fail to adequately identify the "what" or the "how" of any alleged fraud. Such details are critical and their absence renders the Complaint deficient under Rule 9(b).

Finally, the Complaint also fails to specify "why" any alleged statements were false or fraudulent at the time they were made. Plaintiffs allege that Smith used the Illustrations to misrepresent how the Policies would perform in the future. *See, e.g.,* Compl. ¶¶ 2, 29-31, 56, 210, 215d., 231d., 240. But they fail to explain how the depiction of potential future policy performance could be considered false when made. Indeed, the Illustrations expressly state that the values are not guaranteed and are "not intended to predict actual performance." *See, e.g.,* Ex. F-9.

In short, while the Complaint is lengthy, its naked and formulaic assertions lack required particularity and fail to satisfy Rule 9(b). Plaintiffs' fraud-based claims should be dismissed.

## III. PLAINTIFFS' CLAIMS AGAINST PACIFIC LIFE INDEPENDENTLY FAIL

### A. Plaintiffs' UDTPA and Negligent Misrepresentation Claims (Third And Fifth Causes Of Action) Fail As A Matter Of Law

To state a claim under the UDTPA a plaintiff must allege: (1) the defendant committed an unfair or deceptive act or practice; (2) the action in question was in or affecting commerce; and (3) the act proximately caused injury to the plaintiff. *Jackson v. Minn. Life Ins. Co.*, 275 F. Supp. 3d 712, 734 (E.D.N.C. 2017). Where, as here, the UDTPA claim is based on alleged fraudulent misrepresentations, a plaintiff must plead the traditional elements of fraud including: (1) a false representation or concealment of a material fact; (2) reasonably calculated to deceive; (3) made with intent to deceive; (4) which does in fact deceive; and (5) resulting damage to the injured party. *Id.* at 730. Additionally, a plaintiff must plausibly allege that they reasonably relied on the alleged

misrepresentations. *Id.* at 734. "Reliance is not reasonable where the plaintiff could have discovered the truth of the matter through reasonable diligence, but failed to investigate." *Cobb v. Pennsylvania Life Ins. Co.*, 715 S.E. 2d 541, 549-50 (N.C. Ct. App. 2011) (no reliance where minimal investigation would reveal the true meaning of the policy provision; plaintiff had a duty to read his policy and could not "claim he was misinformed on certain elements of his coverage when the terms were clearly expressed in the policy"). Similarly, a claim for negligent misrepresentation requires a false statement of material fact that plaintiff justifiably relied on to his detriment, which was made without reasonable care by one who owed the relying party a duty of care. *Jackson*, 275 F. Supp. 3d at 732. The question of justifiable reliance in negligence misrepresentation claims is analogous to that of reasonable reliance in fraud actions. *Id.* Plaintiffs cannot satisfy the elements of their misrepresentation claims for several reasons.

1. **Plaintiffs' misrepresentation claims fail because they are predicated on statements of opinion or statements concerning future events**

To constitute an actionable misrepresentation, a false representation or omission must relate to a presently existing or pre-existing ***fact***. *See Hale v. MacLeod*, 904 S.E.2d 142, 150 (N.C. Ct. App. 2024). An affirmative promise of future action or a prediction of future events cannot form the basis for a fraud claim because it is not a representation of existing fact, there is no right to rely on it, and it is not false when made. *See Giabourani v. Wells Fargo Bank, N.A.*, 2015 WL 5714538, at *7 (W.D.N.C. Sept. 29, 2015) (promise of future action, predictions, or opinions "are not regarded as fraudulent in law, since they are not misrepresentations of a subsisting fact"); *Synovus Bank v. Karp*, 2014 WL 221209, at *8 (W.D.N.C. Jan. 21, 2014) (same). Further, statements that can be categorized as puffery or opinions are not statements of fact and do not

constitute actionable misrepresentations.[16]

In *Stegelin v. Pacific Life*, the plaintiff alleged that he was induced to participate in a "tax-free" retirement plan by purchasing a Pacific Life IUL policy based on alleged misrepresentations regarding the policy's potential future performance as shown in illustrations. 592 F. Supp. 3d at 481-82, 488. The court rejected that theory, holding that the illustrations' depiction of potential policy performance was non-actionable "[b]ecause non-guaranteed values are, by their very terms, not guaranteed and not intended to predict actual performance":

> The Court notes that the Illustrations expressly state: "This illustration assumes non-guaranteed policy charges and non-guaranteed crediting rates." "Non-guaranteed elements are not guaranteed." "**This is an illustration only. An illustration is not intended to predict actual performance. Interest rates, dividends, or values that are set forth in the illustration are not guaranteed, except for those items clearly labeled as guaranteed.**"

*Id.* at 488-89 (bold font in original). Accordingly, the court held that plaintiff's misrepresentation claim failed as a matter of law because "Pacific Life's conspicuous and repeated disclaimers that all non-guaranteed elements in the illustration were *not guaranteed* refute [plaintiff's] theory that the numerical values of hypothetical future performance were unreasonable assumptions or knowingly false statements of actual economic performance." *Id.* at 489.

Here, as in *Stegelin*, Plaintiffs allege that Pacific Life misrepresented the future performance of the Policies. In particular, Plaintiffs contend that they were told the Policies would be "fully funded" after an unspecified number of years (presumably five) and would provide future

---

[16] *See Packrite, LLC v. Graphic Packaging Int'l, Inc.*, 2018 WL 4112827, at *5-7 (M.D.N.C. Aug. 29, 2018) (dismissing fraudulent and negligent misrepresentation and UDTPA claims where allegations did not contain specific facts showing alleged representations were false when made); *Global Hookah Dist., Inc. v. Avior, Inc.*, 401 F. Supp. 3d 653, 660-62 (W.D.N.C. 2019) (dismissing misrepresentation and UDTPA claims where complaint failed to allege representations that could be considered false when made).

tax-free retirement income on a guaranteed basis "for life." *See, e.g.,* Compl. ¶¶ 28, 33, 86, 212. However, non-guaranteed projections in the Illustrations cannot constitute misrepresentations because they do not involve false statements of past or *existing fact* and are non-actionable opinions on future events. Indeed, the Illustrations here contain the exact same disclosure as in *Stegelin* (*see supra* p. 9), making it abundantly clear that they are *not* affirmative factual statements. Plaintiffs' claims should be dismissed. *See Stegelin*, 592 F. Supp. 3d at 488-89.[17]

### 2. Plaintiffs do not plead, and cannot establish reasonable or justifiable reliance on any purported misrepresentations or omissions

Plaintiffs' claim of being promised "fully funded" policies and "tax-free retirement income" for life, after only a "limited" number of premium payments, also fails because Plaintiffs cannot establish justifiable reliance as a matter of law. For example, Plaintiffs selected a Planned Annual Premium of $1,000,000 for the Feb. 2018 Policy. Ex. A-3. The Policy states: "Payment of the Planned Premium *does not guarantee* that the Policy will continue in Force." Ex. A-40. In order to keep the Policy in force, the Net Accumulated Value (which is not guaranteed) must be sufficient to pay the monthly charges. Ex. A-46. "If the Net Accumulated Value is less than the monthly charges, *you will need to pay additional premium* to keep the policy in force, unless the policy has a no-lapse guarantee in effect." Ex. F-11. The Illustration shows five planned premium payments of $1,000,000 in the "Premium Outlay" column with a zero beginning in year 6. Ex. F-2. The Illustration expressly states that "[a] zero in the Premium Outlay column *does not mean the policy is paid up*," and that "[t]he actual premium amounts and *number of years* of premium

---

[17] *See also Krall v. Life Ins. Co. of Sw.*, 2010 WL 11595829, at *2 (C.D. Cal. Mar. 3, 2010) (dismissing negligent misrepresentation claims because "the illustration's examples regarding future returns cannot be considered promises, as they are explicitly and repeatedly deemed non-guaranteed"); *see also Giabourani*, 2015 WL 5714538, at *7-9 (misrepresentation claims failed because representations regarding potential property values or viability of plaintiff's investment were non-actionable opinions or predictions).

payments that are needed to maintain the illustrated non-guaranteed policy benefits will depend on the policy's non-guaranteed elements …." Instead of retirement payments "for life," the Illustration shows tax-free policy loans ending when Kyle Busch reaches 70 years old. Ex. F-3.

"[B]ecause the Illustrations include written disclosures that refute any claim of reliance," "any reliance *would not be justifiable as a matter of law*." *Stegelin*, 592 F. Supp 3d at 490. For that additional reason, Plaintiffs' misrepresentation claims fail as a matter of law and should be dismissed. *See also Jackson*, 275 F. Supp. 3d at 730-32, 734 (dismissing misrepresentation and UDTPA claims; plaintiffs cannot justifiably or reasonably rely on alleged misrepresentations in policy illustrations that are contradicted or disclosed by the plain terms of the policy); *Terracino v. Trimaco, Inc.*, 2023 WL 2656753, at *4 (E.D.N.C. Mar. 27, 2023) (dismissing misrepresentation and UDTPA claims; "reliance on [defendant's] oral representations in the face of contradicting contractual terms is not reasonable"); *Karp*, 2014 WL 221209, at *8-9 (reliance on representations regarding potential property value unreasonable where purchase agreements "expressly warned [plaintiffs] that there was no guarantee the property would appreciate").

## B.     Plaintiffs' Negligence Claim (Second Cause Of Action) Fails

A negligence claim requires (i) the existence of a legal duty, (ii) a breach of that duty, and (iii) injury proximately caused by that breach. *Synovus Bank v. Coleman*, 887 F. Supp. 2d 659, 672 (W.D.N.C. 2012). When a claim for negligence has been asserted, the court must first determine, as a matter of law, whether the defendant owed a duty of care to the plaintiff. *Id.* "If no duty exists, there logically can be neither breach of duty nor liability." *Id.* (citation omitted).

Plaintiffs contend that Pacific Life either vicariously or directly owed them a duty to ensure the proposed policies and retirement strategy that Smith recommended were suitable for their financial objectives. *See* Compl. ¶¶ 191, 196. However, Plaintiffs do not identify, and Pacific

Life is not aware of, any law that imposes such a duty on an insurance company. While North Carolina regulates suitability in connection with the sale of *annuities*, *see* 11 N.C. Admin. Code § 12.0462 (adopting NAIC model suitability law for annuities), neither the North Carolina Insurance Code, nor the implementing regulations, contain suitability requirements for *life insurance* policies. *See Ryan v. Salisbury*, 2019 WL 5269092, at *12 n.16 (D. Haw. Oct. 17, 2019) (examining nearly identical model insurance regulations and holding that "duties on insurers related to suitability" arise only "in the context of annuities, not life insurance policies").

Moreover, Plaintiffs acknowledged and agreed when applying for their Policies that Pacific Life was not undertaking a duty to provide suitability advice, and that only Plaintiffs and the producer were responsible to determine whether the proposed policies met Plaintiffs' "insurance needs and financial objectives." *See supra* p. 7 & n.10 (quoting Application). Plaintiffs are bound by their agreement. Each Illustration also expressly states that Pacific Life "does not give advice or make recommendations regarding insurance or investment products." *See infra* note 18. In sum, Plaintiffs have no basis for imposing on Pacific Life a duty to advise them on whether their Policies satisfied their needs or retirement strategy.

Plaintiffs cite various emails in an attempt to create a duty where none exists, arguing that Pacific Life involved itself in the sales process and provided advice with respect to how Plaintiffs should structure their retirement strategy. Compl. ¶¶ 188-95. But the emails they rely upon say no such thing. For example, Plaintiffs refer to a January 15, 2021 email from Pacific Life. *Id.* ¶¶ 61-63 & Compl. Ex. 3. However, that email was sent almost three years *after* Plaintiffs purchased their original Policies and a year after they purchased their 2020 Policies, and it is not even addressed to Plaintiffs—it is addressed to Smith. *Id.* Nothing in this email (or any other) creates a legal duty on the part of Pacific Life to advise Plaintiffs on their financial decisions. Given that

no cognizable legal duty exists as to Pacific Life, Plaintiffs' negligence claim fails.

### C. Plaintiffs' Breach Of Fiduciary Duty Claim (Fourth Cause Of Action) Fails

To establish a claim for breach of fiduciary duty, a plaintiff must allege: (1) the defendant owed the plaintiff a fiduciary duty; (2) the defendant breached that fiduciary duty; and (3) the breach of fiduciary duty was a proximate cause of injury to the plaintiff. *Sykes v. Health Network Solutions, Inc.*, 828 S.E.2d 467, 475 (N.C. 2019). A fiduciary relationship has been defined as "one in which there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Id.* at 475-76. An essential element of a fiduciary relationship is that the purported fiduciary exercised dominance and undue influence over the plaintiff by virtue of the trust placed in the fiduciary. *Dalton v. Camp*, 548 S.E.2d 704, 708 (N.C. 2001). A party may not, however, "unilaterally place his or her trust in another party and thereby impose a fiduciary relationship on that other party which that other party did not accept." *Diamond Falls Estates, LLC v. Nantahala Bank & Trust Co.*, 2015 WL 5233010, at *15 (W.D.N.C. Sept. 8, 2015). There is no such relationship between an insurer and an insured. *See Setzer v. Old Republic Life Ins. Co.*, 126 S.E.2d 135, 137 (N.C. 1962) (holding insurer had no special duty to advise its insured; "[a]n insurance company is not a trustee for its insured"). Moreover, the Illustrations unequivocally state: "***Pacific Life is a product provider. It is not a fiduciary and therefore does not give advice or make recommendations regarding insurance or investment products.***"[18]

Even assuming a fiduciary relationship could exist in theory, Plaintiffs have not alleged sufficient facts to establish such a relationship with Pacific Life, or to show that Pacific Life agreed

---

[18] Illustrations, Ex. F-1; Ex. G-1; Ex. H-16, H-56, H-73, H-113; Ex. I-16, I-69, I-109; Ex. J-21 (bold and italics in originals).

to act as a fiduciary. Plaintiffs rely on various emails to show a relationship, but *none* of these emails are communications between Plaintiffs and Pacific Life. The conclusory allegation that Plaintiffs placed their trust in Pacific Life based on its "institutional reputation" (Compl. ¶ 223) is plainly insufficient. *See ATV Broadcast, LLC v. Bahakel Comms., Ltd.*, 2021 WL 134692, at *2 (W.D.N.C. Jan. 13, 2021) (dismissing fiduciary duty claim where no basis was alleged for a fiduciary relationship); *Diamond Falls Estates, LLC*, 2015 WL 5233010, at *15 (plaintiff cannot "unilaterally place his or her trust in another party and thereby impose a fiduciary relationship on that other party which that other party did not accept").

Even if Plaintiffs could allege the existence of a fiduciary relationship, their claim still fails because they cannot identify any breach. Plaintiffs allege Pacific Life breached its purported fiduciary duty by failing to disclose "the non-guaranteed nature of the crediting rate, the policy's dependence on Indexed Loans, the risk of lapse, and the need for ongoing premiums to prevent early termination," and by misrepresenting that the Policies would be "self-funding" and "tax-free retirement income" plans, by using "deceptive illustrations … that overstated performance." Compl. ¶¶ 231.b.-d. However, the Illustrations and Policies expressly refute those allegations and disclose the very information that Plaintiffs allege was misrepresented or omitted. Because Plaintiffs have failed to plead facts sufficient to plausibly establish the existence of a fiduciary relationship with Pacific Life, or any breach of duty, their claim fails as a matter of law.

## CONCLUSION

For the reasons set forth above, the Court should dismiss all claims alleged in the Complaint against Pacific Life with prejudice.

Dated:  January 22, 2026          Respectfully submitted,

/s/  Sarah Fulton Hutchins
Sarah Fulton Hutchins (NC Bar No. 38172)
PARKER POE ADAMS & BERNSTEIN LLP
620 South Tryon Street, Suite 800
Charlotte, North Carolina 28202
Telephone:  (704) 372-9000
Facsimile:  (704) 334-4706
sarahhutchins@parkerpoe.com

Andrew P. Tabeling (NC Bar No. 58243)
PARKER POE ADAMS & BERNSTEIN LLP
301 Fayetteville Street, Suite 1400
Raleigh, North Carolina 27601
Telephone:  (919) 828-0564
Facsimile:  (919) 834-4564
andytabeling@parkerpoe.com

Markham R. Leventhal (*pro hac vice*)
CARLTON FIELDS, P.A.
1625 Eye Street, NW, Suite 800
Washington, DC 20006
Telephone:  (202) 965-8100
Facsimile:  (202) 965-8104
mleventhal@carltonfields.com

Todd M. Fuller (*pro hac vice*)
CARLTON FIELDS, P.A.
2 MiamiCentral, Suite 1200
700 NW 1st Avenue
Miami, Florida 33136
Telephone:  (305) 530-0050
Facsimile:  (305) 530-0055
tfuller@carltonfields.com

*Counsel for Defendant*
*Pacific Life Insurance Company*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 22nd day of January, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which in turn automatically generated a Notice of Electronic Filing (NEF) to all parties in the case who are registered users of the CM/ECF system. The NEF for the foregoing specifically identifies the recipients of electronic notice.

This, the 22nd day of January, 2026.

/s/ Sarah Fulton Hutchins
Sarah Fulton Hutchins (NC Bar No. 38172)
PARKER POE ADAMS & BERNSTEIN LLP
620 South Tryon Street, Suite 800
Charlotte, North Carolina 28202
Telephone: (704) 372-9000
Facsimile: (704) 334-4706
sarahhutchins@parkerpoe.com

## <u>ARTIFICIAL INTELLIGENCE CERTIFICATION</u>

Undersigned counsel hereby certifies, in compliance with Standing Order 3:24-MC-104:

1.  No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, Fastcase, and Bloomberg; and

2.  Every statement and every citation to an authority contained in this document has been checked by an attorney in this case and/or a paralegal working at their direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This, the 22nd day of January, 2026.

/s/ Sarah Fulton Hutchins
Sarah Fulton Hutchins (NC Bar No. 38172)
PARKER POE ADAMS & BERNSTEIN LLP
620 South Tryon Street, Suite 800
Charlotte, North Carolina 28202
Telephone: (704) 372-9000
Facsimile: (704) 334-4706
sarahhutchins@parkerpoe.com